UNITED STATES of America ex rel. Herbert EDNEY, Petitioner,

v.

Harold SMITH, Superintendent, Attica Correctional Facility, Respondent.

No. 76–C–1289.

United States District Court, E. D. New York.

Nov. 24, 1976.

Denis Dillon, Dist. Atty. of Nassau County, for respondent; William C. Donnino, Robert N. Zausmer, Mineola, N. Y., of counsel.

James J. McDonough, Legal Aid Society, Mineola, N. Y., for petitioner.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Petitioner seeks a writ of habeas corpus. 28 U.S.C. § 2254. He was found guilty in a New York State court of the kidnapping and killing of the eight-year-old daughter of his former girlfriend. *People v. Edney*, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1976). His claim now is that the State violated his federal constitutional rights by calling a psychiatrist who had interviewed petitioner before trial at his counsel's request. While the rules of privilege relied upon by petitioner are preferred, they are not constitutionally mandated. For the reasons detailed below the petition must be denied.

## FACTS

At the trial the only significant issue was sanity. A defense psychiatrist testified that defendant, as a result of mental illness, was unaware of the nature and quality of his acts and did not know that his acts were wrong. In rebuttal, the prosecution called Dr. Daniel Schwartz, a psychiatrist, who had examined defendant at the request of defendant's attorney. The attorney had not been present during the examination. The defense objected on the grounds of the attorney-client and physician-patient privileges. Dr. Schwartz found no evidence of an underlying disease or defect. It was his opinion that at the time of the murder defendant knew and appreciated the nature of his conduct and knew that his conduct was wrong. Another psychiatrist for the prosecution supported the conclusions of Dr. Schwartz. Additional psychiatrists, produced by the defense, were unable to form opinions as to whether defendant knew or appreciated the nature of his acts, or

whether such acts were wrong, although they did agree that defendant had some form of mental illness.

The jury found the petitioner guilty and he was sentenced to 25 years to life. He appealed, chiefly on the ground that the admission of Dr. Schwartz's testimony over objection was reversible error. The Appellate Division unanimously affirmed. 47 A.D.2d 906, 366 N.Y.S.2d 219 (1975). Its order was in turn affirmed by the Court of Appeals, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1976).

The State's highest court, in a full opinion, with one judge dissenting, discussed the privilege issue. It held that where the defense of insanity was asserted and the defendant offered evidence to establish the claim, a waiver of privileges was effected. Under such circumstances, it concluded, the prosecution could call a psychiatric expert who had examined the defendant at his attorney's request.

The sole issue before this court in this habeas corpus proceeding is whether the admission of Dr. Schwartz's testimony violated petitioner's federal constitutional rights. Petitioner anchors his constitutional claim primarily to the Sixth Amendment guarantee of effective assistance of counsel. He argues that unless the communications of a defendant to a psychiatrist are protected by either the physician-patient or attorney-client privilege an accused, fearing revelation of these communications to the State will not be candid with the psychiatrist. This will, in turn, impede the lawyer's ability to present the effective defense guaranteed by the Constitution. Thus, his argument goes, by necessary implication, either the attorney-client or physician-patient privilege is, to the extent indicated by the facts of this case, embodied in the Sixth Amendment.

## PHYSICIAN–PATIENT PRIVILEGE

The physician-patient relationship, unlike that of attorney-client, did not give rise to a testimonial privilege at common law; a physician called as a witness had a duty to disclose all information obtained from a patient. *See generally* 8 Wigmore, Evidence §§ 2380–2391 (McNaughton rev. 1961). In 1828 New York became the first jurisdiction to alter the common-law rule by establishing a statutory privilege. N.Y.Rev.Stat. 1828, 406 (pt. 3, ch. 7, Tit. 3, Art. 9, § 73). Since that time approximately three-quarters of the states have followed New York's lead and enacted similar statutory provisions. 8 Wigmore, Evidence § 2380 (McNaughton rev. 1961).

Legal scholars have been virtually unanimous in their condemnation of these legislative attempts to foster the doctor-patient relationship by rules of exclusion. *See, e. g.,* 8 Wigmore, Evidence § 2380a at 831–32 (McNaughton rev. 1961); Morgan, Suggested Remedy for Obstructions to Expert Testimony by Rules of Evidence, 10 U.Chi.L. Rev. 285, 290–92 (1943); Slovenko, Psychotherapy, Confidentiality, and Privileged Communication 20–24 (1966). They repeatedly argue that while the adverse impact of the privilege on the fact-finding function of the courts is immediate and unquestionable, empirical evidence of the alleged benefits of the privilege is speculative at best and more realistically non-existent. Professor Chafee's well-known criticism is typical:

The reasons usually advanced for extending the privilege of silence to the medical profession are not wholly satisfactory. First, it is said that if the patient knows that his confidences my be divulged in future litigation he will hesitate in many cases to get needed medical aid. But although the man who consults a lawyer usually has litigation in mind, men very rarely go to a doctor with any such thought. And even if they did, medical treatment is so valuable that few would lose it to prevent facts from coming to light in court. Indeed, it may be doubted whether, except for a small range of disgraceful or peculiarly private matters, patients worry much about having a doctor keep their private affairs concealed from the world. This whole argument that the privilege is necessary to induce persons to see a doctor sounds

like a philosopher's speculation on how men may logically be expected to behave rather than the result of observation of the way men actually behave. Not a single New England state allows the doctor to keep silent on the witness stand. Is there evidence that any ill or injured person in New England has ever stayed from a doctor's office on that account?

The same a priori quality vitiates a second argument concerning the evils of compelling medical testimony, namely, that a strong sense of professional honor will prompt perversion or concealment of the truth. Has any member of the numerous medical societies in New England observed such a tendency among New England doctors to commit perjury for the sake of "professional honor"?

Chafee, Privileged Communications: Is Justice Served or Obstructed by Closing the Doctor's Mouth on the Witness Stand?, 52 Yale L.J. 607, 609–10 (1943).

Legal practice in the states which have adopted a general medical privilege confirms the criticism of the commentators. Although no state has repealed the privilege once it has been adopted, recognition of its undesirable effects has led to judicial and legislative whittling away so that its scope has been considerably reduced. Numerous nonuniform exceptions have evolved which have rendered the privilege "substantially impotent," Comment, Federal Rules of Evidence and the Law of Privileges, 15 Wayne L.Rev. 1286, 1324 (1969), and difficult to administer.

In the federal sphere awareness of these difficulties led the Advisory Committee on the Federal Rules of Evidence to omit any provision for a general physician-patient privilege. It noted that:

[w]hile many states have by statute created the privilege, the exceptions which have been found necessary in order to obtain information required by the public interest or to avoid fraud are so numerous as to leave little if any basis for the privilege.

Advisory Committee's Note to Proposed Rule 504, 56 F.R.D. 183, 241–242 (1972).

These extensive criticisms bear strongly on whether the states and federal government are subject to constitutional pressures to afford protection to physician-patient communications. It is implausible that a privilege that has almost uniformly been found to be practically undesirable and burdensome should nonetheless be constitutionally compelled. Nonetheless, it has been suggested that the doctor-patient relationship, even absent statutorily privileged status, is entitled to constitutional protection. Thus, in criticizing the absence of a general doctor-patient privilege in the proposed Federal Rules of Evidence, Professor Charles L. Black, relying on the right to privacy, eloquently declared:

There is something very important at stake in these Rules of Evidence. At several points they give major aid and comfort to that diminishment of human privacy which is one of the greater evils of our time, thus raising not only prime questions of value, but also questions of constitutional law which could never have been dismissed as trivial, but which are even more plainly substantial in the light of such recent decisions as Griswold v. Connecticut, 381 U.S. 479 [, 85 S.Ct. 1678, 14 L.Ed.2d 510] (1965). . . . The question here is not only whether people might be discouraged from making full communication to physicians, though it seems flatly impossible that this would not sometimes happen—a consideration which would in itself be enough to make incomprehensible the absolute subordination of this privacy interest to any trivial interest arising in litigation. But evaluation of a rule like this entails not only a guess as to what conduct it will motivate, but also an estimate of its intrinsic decency. All of us would consider it indecent for a doctor, in the course, say, of a television interview, or even in a textbook, to tell all he knows, naming names, about patients who have been treated by him. Why does this judgment of decency altogether vanish from sight, sink to absolute zero, as soon as somebody files any kind of a non-demurrable complaint in a

federal court? Here, again, can a rule be a good one when the ethical doctor *must* violate it, or hedge, or evade?

In *Rochin v. California*, 342 U.S. 165 [, 72 S.Ct. 205, 96 L.Ed. 183] (1952), the late Mr. Justice Frankfurter, for the Court, condemned as utterly indecent the forced pumping of a man's stomach to get criminal evidence. Does not the forced revealing of every medical and personal fact, stomach contents and all, learned by the doctor of a person not even suspected of anything, just to serve the convenience of any litigant, partake at least a little of the same indecency? Do not these and many other considerations lead to the discernment of constitutional as well as policy issues here? If so, then the same remarks as those made above apply to the posture in which those constitutional issues are put by the promulgation of these Rules.

Hearings on Proposed Rules of Evidence Before the Special Subcommittee on Reform of Federal Criminal Laws of the House Comm. on the Judiciary, 93d Cong., 1st Sess., Ser. 2 at 241–42 (1973) (emphasis in original).

The substance of Professor Black's thesis was incorporated in a recent federal decision which was, however, subsequently reversed by the Supreme Court. *Roe v. Ingraham*, 403 F.Supp. 931 (S.D.N.Y.1975), *rev'd sub nom. Whalen v. Roe*, —— U.S. ——, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Suit was brought challenging the constitutionality of New York Public Health Law provisions under which all prescriptions containing Schedule II substances must be filed in Albany with the Bureau of Controlled Substances on forms supplied by the State. In finding the reporting provisions an unconstitutional interference with rights of privacy guaranteed under the Fourteenth Amendment a three-judge district court held that a constitutionally protected right of privacy embraces the physician-patient relationship. The court relied on Justice Blackmun's opinion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in tracing the right of privacy to

"a line of decisions . . . going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) [that] has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy" are given constitutional protection. *Roe v. Wade, supra*, 410 U.S. at 152, 93 S.Ct. at 726. It was pointed out that the right of privacy had been said to rest on the First Amendment. *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); the Fourth and Fifth Amendments, *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); the penumbras of the Bill of Rights, *Griswold v. Connecticut, supra*, 381 U.S. at 484–485, 85 S.Ct. 1678; on the Ninth Amendment, *Id.* at 486, 85 S.Ct. 1678 (Goldberg, J. concurring), and on the Fourteenth Amendment, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

403 F.Supp. at 935–36.

The district court then went on to read *Roe v. Wade* as holding implicitly and *Doe v. Bolton*, 410 U.S. [179] at 197, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), as holding explicitly that the doctor-patient relationship is one of the zones of privacy accorded constitutional protection. . . While the doctor-patient relationship involved in *Roe* and *Doe* concerned the most intimate personal relationships, sexual relations and "whether to bear or beget a child," *Eisenstadt v. Baird, supra*, 405 U.S. [438] at 453, 92 S.Ct. [1029] at 1038 [31 L.Ed.2d 349], and the right of privacy has primarily focused on home and family, it would be too restricted a reading of precedent for us to hold that the physician-patient relationship here is not constitutionally protected merely because it does not concern medical advice or professional judgments concerning child bearing. *See Roe v. Ingraham*, 480 F.2d 102, 107 (2d Cir. 1973). An individual's physical ills and disabilities, the medication he takes, the fre-

quency of his medical consultation are among the most sensitive of personal and psychological sensibilities. One does not normally expect to be required to have to reveal to a government source, at least in our society, these facets of one's life.

403 F.Supp. at 936–37.

While the district court's argument has force, some well reasoned federal cases (decided before *Roe* and *Doe*) take a directly contrary view. *Felber v. Foote*, 321 F.Supp. 85 (D.Conn.1970), involved a psychiatrist's action for himself and all practitioners of the healing arts in Connecticut for declaratory and injunctive relief from enforcement of a statute compelling them to report the names of, and other information about, drug-dependent persons to the Commissioner of Health. In denying relief the three-judge district court held that "[t]here is no constitutional foundation for the cloak of confidentiality which gives a patient the privilege to exclude communications by him to his physician in judicial proceedings." 321 F.Supp. at 87. The court went on to state:

> Plaintiff further makes the unwarranted assumption that the special nature of the doctor-patient relationship affords him a constitutionally protected right to privacy in his conduct of the relationship. There is no "general constitutional right to privacy." The plaintiff's conception of "privacy" which he seeks to protect bears no analogy to those spheres of privacy which have previously won constitutional protection.

321 F.Supp. at 88 (citations omitted). *Cf. United States v. Mullings*, 364 F.2d 173, 176 n. 3 (2d Cir. 1966); *Rumler v. Board of Sch. Tr. for Lexington Co. Dist. No. 1*, 327 F.Supp. 729, 742–43 (D.S.C.), *aff'd per curiam*, 437 F.2d 953 (4th Cir. 1971); *Caesar v. Mountanos*, F.Supp. (N.D.Cal.1976) (three-judge court).

Whatever merit these privacy arguments have in favor of a general patient-physician privilege their persuasiveness is increased where the medical relationship implicated is that between psychotherapist and patient. First, the pragmatic, empirical objections to the rationale of the general physician-patient privilege are not applicable to this specialized relationship. The practical need for and efficacy of a privilege covering this unique relationship is clear.

> "Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients of confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . . ., there is wide agreement that confidentiality is a *sine qua non* for· successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment."

Advisory Committee Notes to Proposed Rule 504, Federal Rules of Evidence, 56 F.R.D. 183, 242 (1972), quoting Report No. 45, Group for the Advancement of Psychiatry 92 (1960).

Second, and perhaps more significant for the purpose of determining the validity of a constitutional claim grounded in a right to privacy, is the depth and extraordinarily intimate nature of the patient's revelations.

> "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—

may be revealed to the whole world from a witness stand."

*Taylor v. United States,* 95 U.S.App.D.C. 373, 222 F.2d 398, 401 (1955), quoting from Guttmacher and Weihofen, Psychiatry and the Law 272 (1952).

In consideration of this deep-rooted and justifiable expectation of confidentiality harbored by most individuals seeking psychiatric therapy the California Supreme Court has said, in dictum, that

a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California [statutory rules of evidence] and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut, supra,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, the United States Supreme Court declared that "Various guarantees [of the Bill of Rights] create zones of privacy," and we believe that the confidentiality of the psychotherapeutic session falls within one such zone.

*In Re Lifschutz,* 2 Cal.3d 415, 431, 85 Cal. Rptr. 829, 839, 467 P.2d 557, 567 (1970). This strong subjective desire and pragmatic need for privacy in the psychotherapist-patient relationship is certain to give birth to intricate, far-reaching questions of constitutional law. But we need not consider the validity of any such broad contentions in our disposition of this petition.

To the extent that the desirability or constitutionality of the psychiatrist-patient privilege is grounded in its tendency to promote that relationship for purposes of diagnosis and treatment and to increase the likelihood of the ultimate success of such consultations, the privilege cannot be supported on the facts of the instant case. The record indicates that petitioner's examination by Dr. Schwartz was for the purpose of litigation—to enable Edney's attorney to more effectively explore the defenses available to his client. Petitioner and his attorney sought neither treatment nor diagnosis for medical purposes, but rather expert advice for legal purposes. The relationship actually implicated by the facts of this case

is that of attorney-client, for it was the petitioner's interest in effective legal advice, rather than in effective psychotherapeutic counseling, that was sought to be furthered by the consultation with Dr. Schwartz.

A significant number of state courts have recognized and relied on this distinction in interpreting and determining the non-applicability of their own statutory physician-patient privileges to analogous fact-patterns. *See Lindsay v. Lipson,* 367 Mich. 1, 116 N.W.2d 60 (1962); *People v. Hilliker,* 29 Mich.App. 543, 185 N.W.2d 831 (1971); *People v. Lines,* 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975) (S.Ct. en banc); *City & County of San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951); *State v. Kociolek,* 23 N.J. 400, 129 A.2d 417 (1957). The inapplicability of a physician-patient analysis to a situation similar to that now before us was also recognized by the one published federal opinion discussing this precise issue. *See United States v. Alvarez,* 519 F.2d 1036, 1046 n. 13 (3d Cir. 1975).

The reasoning in these cases seems to us to be irrefutable. But even were we to assume that the physician-patient privilege is somehow remotely involved here, we simply could not find a constitutional flaw in the New York rule that when the issue as to which the physician has knowledge is placed in question by the party relying on the privilege—typically in negligence cases, but in criminal proceedings as well—the privilege is deemed waived. The New York Court of Appeals put its reasons persuasively in stating the rule and its waiver rationale in this case:

"where insanity is asserted as a defense and * * * the defendant offers evidence tending to show his insanity in support of this plea, a complete waiver is effected, and the prosecution is then permitted to call psychiatric experts to testify regarding his sanity even though they may have treated the defendant. When the patient first fully discloses the evidence of his affliction, it is he who has given the public the full details of his

case, thereby disclosing the secrets which the statute was designed to protect, thus creating a waiver removing it from the operation of the statute; and once the privilege is thus waived, there is nothing left to protect against for once the revelation is made by the patient there is nothing further to disclose 'for when a secret is out it is out for all time and cannot be caught again like a bird, and put back in its cage. * * * The legislature did not intend to continue the privilege when there was no reason for its continuance and it would simply be an obstruction to public justice' ".

*People v. Edney,* 39 N.Y.2d 620, 624, 385 N.Y.S.2d 23, 25, 350 N.E.2d 400, 402 (1976) (quoting from *People v. Al-Kanani,* 33 N.Y.2d 260, 264–65, 351 N.Y.S.2d 969, 971, 307 N.E.2d 43 (1973) (citations omitted).

Identical reasons have been given for numerous state court decisions adopting the same waiver rule. *See Hudman v. State,* 89 Okl.Cr. 160, 205 P.2d 1175 (1949); *Lockridge v. State,* Ind., 338 N.E.2d 275 (1975); *State v. Tradewell,* 9 Wash.App. 821, 515 P.2d 172 (1973); *People v. Givans,* 83 Ill.App.2d 423, 228 N.E.2d 123 (1967); *People ex rel. McNutt v. Keet,* 432 S.W.2d 597 (1968) (S.Ct.Mo. en banc). And a recent federal case supports the same trend. *See Caesar v. Mountanos,* F.Supp. (N.D.Cal.1976) (three-judge court).

Even those commentators who vigorously advocate a general broadening of the psychotherapist privilege acknowledge the justifiability of compelling the disclosure of relevant psychotherapeutic communications when the patient has himself raised an issue concerning his mental condition. Two "model" psychotherapist-patient privilege acts, drafted by such proponents, have included a provision recognizing a patient-litigant exception. Note, A State Statute to Provide A Psychotherapist-Patient Privilege, 4 Harv.J.Legis. 307, 322 (1968); Fisher, The Psychotherapeutic Professions and the Law of Privileged Communication, 10 Wayne L.Rev. 609, 644 (1964).

Uniform Rule of Evidence 504 adopted by the Commissioners on Uniform State Laws in 1974, while creating a psychotherapist-patient privilege, also provides for its waiver

> as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense . . . .

Uniform Rule 504(d)(3). The substance of the Uniform Rule and its waiver provision have been enacted in all seven states following the 1974 Uniform Rules of Evidence. Ark.Stat.Ann. Uniform Rules of Evidence, Rule 503 (noncum. Supp.1976); Fla.Stat. Ann. § 90.503 (Supp.1976); Me.Rev.Stat. Ann. Maine Rules of Evidence, Rule 503 (Supp.1975); Neb.Rev.Stat. § 27–504 (Supp. 1975); Nev.Rev.Stat. §§ 49.215–49.245 (1973); N.M.Stat.Ann. § 20–4–504 (Supp. 1975); Wis.Stat.Ann. § 905.04 (1975).

In embracing this strong legislative, judicial and scholarly trend New York has, like its sister states, neither chosen to enshroud "the patient's communication to the psychotherapist in the black veil of absolute privilege" nor to expose "it to the white glare of absolute publicity." *In Re Lifschutz,* 2 Cal.3d 415, 422, 85 Cal.Rptr. 829, 833, 467 P.2d 557, 561 (1970). Given this background, it is difficult to say that the states have grossly and unconstitutionally discounted the acknowledged need of confidentiality in the psychiatrist-patient relationship against the pressing societal need for the ascertainment of truth in litigation.

Our opinion is strongly buttressed by consideration of Rule 504 of the Federal Rules of Evidence as promulgated by the Supreme Court. 56 F.R.D. 183, 240–41 (1973). As noted earlier, the Rules contained no provision for a general physician-patient privilege. They did incorporate a psychotherapist-patient privilege.

Rule 504

PSYCHOTHERAPIST–PATIENT PRIVILEGE

(b) *General rule of privilege.* A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of

his mental or emotional condition, including drug addiction, among himself, his psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

Even under that Rule, however, placing the patient's condition in issue would have constituted a waiver. Subsection (d)(3) of the Rule provided:

(d) Exceptions.

\* \* \*

(3) *Condition an element of claim or defense.*—There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense. . . .

*Id.* The Advisory Committee noted: "By injecting his condition into litigation, the patient must be said to waive the privilege, in fairness and to avoid abuses." 56 F.R.D. at 244.

■ Although the rules of privilege embodied in Rule 504 as promulgated by the Supreme Court were not adopted by Congress, the Supreme Court has, in effect, rendered an advisory opinion on their constitutionality. *Cf. Hanna v. Plumer,* 380 U.S. 460, 476, 85 S.Ct. 1136, 1146–47, 14 L.Ed.2d 8, 20 (1965) (Harlan, J. concurring); *S.C.M. Corp. v. Xerox Corp.,* 70 F.R.D. 508, 522 (D.Conn.1976); Hart and Wechsler, The Federal Courts and the Federal System 748 (2d ed. 1973); Wright, Law of Federal Courts 413 (2d ed. 1970). In light of this fact and the other considerations previously adduced, the aspect of petitioner's claim based on a physician-patient relationship must fail. We turn now to consider the attorney-client privilege.

## ATTORNEY–CLIENT PRIVILEGE

The attorney-client privilege is the oldest of the privileges for confidential communications. 8 Wigmore, *Evidence* § 2290 at 542 (McNaughton rev.1961). It was originally based on the theory that the privilege belonged to the attorney, "permitting him to keep the secrets confided in him by his client and thus preserve his honor." *In re Colton,* 201 F.Supp. 13, 15 (S.D.N.Y.1961), *aff'd sub nom. Colton v. United States,* 306 F.2d 633 (2d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). That notion fell into disfavor in the eighteenth century when "the emphasis upon the code of honor had lessened and the need of the ascertainment of truth for the ends of justice loomed larger than the pledge of secrecy." McCormick, *Evidence* § 87 at 175 (Cleary, 2d ed. 1972); Gardner, A Reevaluation of the Attorney-Client Privilege, 8 Vill. L.Rev. 279 (1963).

The privilege now rests on the theory that encouraging clients to make the fullest disclosure to their attorneys enables the latter to act more effectively, justly and expeditiously—benefits out-weighing the risks to truth-finding posed by barring full disclosure in court.

The proposition is that the detriment to justice from a power to shut off inquiry to pertinent facts in court, will be outweighed by the benefits to justice (not to the client) from a franker disclosure in the lawyer's office.

McCormick, *Evidence* § 87 at 175 (Cleary, 2d ed. 1972).

■ The extent to which the privilege includes communications to a non-lawyer by the lawyer's client is determined by balancing two competing factors: 1) The need of the attorney for the assistance of the non-lawyer in effectively representing the client, and 2) The increased potential for inaccuracy in the truth-finding process as the trier of fact is deprived of valuable witnesses.

Given the complexities of modern existence few, if any, lawyers could as a practical matter represent the interests of their clients without the assistance of a variety of trained legal associates not yet admitted to the bar, clerks, typists, messengers, and similar aides.

The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or

by the client himself, the privilege must include all the persons who act as the attorney's agents.

8 Wigmore, *Evidence* § 2301 at 583 (McNaughton rev. 1961).

There has been a tendency to expand this class of privileged "agents" to include various specialists that an attorney must consult in effectively representing his client. As a consequence, in a number of states when a client, acting on his attorney's advice, consults a physician for the purpose of obtaining testimony, data or recommendations for litigation purposes, the resultant communications are protected by the attorney-client privilege. This is so even though the communication will not be afforded the physician-patient privilege because, either a) the consultation was for the purposes of preparation for litigation, rather than treatment, and no physician-patient relationship arose, or b) putting the patient's condition in issue in the case constituted a waiver of this privilege.

One line of cases, originating in California, has justified this extension of the privilege on the ground that in these circumstances the physician is merely acting as a conduit, relating the client's communications to the attorney. Alternatively, the psychiatrist is likened to an interpreter, without whom neither attorney nor client could understand the significance of the client's information. *See City & County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951); *Lindsay v. Lipson*, 367 Mich. 1, 116 N.W.2d 60 (1962); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975) (harmless error because cumulative); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957).

The conceptual ground offered for the extension is not beyond criticism, for the doctor's observations and conclusions are based upon far more than the client's communications. As Professor Friedenthal has noted:

> The court[s fail] to discuss the fact that the doctor's observations and conclusions, apart from the client's communications to

him, constituted knowledge on the part of the doctor which would be highly material to the case. Thus, in transmitting the "client's communication" the doctor became far more than a mere interpreter, for he added an important increment of knowledge of his own. It seems that this knowledge should be treated just like the knowledge of any other witness and should be discoverable from the doctor himself.

Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan. L.Rev. 455, 463–64 (1962) (footnote omitted).

Nonetheless, from a pragmatic perspective the extension is desirable. Only a foolhardy lawyer would determine tactical and evidentiary strategy in a case with psychiatric issues without the guidance and interpretation of psychiatrists and others skilled in this field. *Cf. United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("analogy of the client speaking a foreign language"). As Chief Judge Haynsworth reminded us:

> The assistance of a psychiatrist is crucial in a number of respects to an effective insanity defense. In the first place, the presence or absence of psychiatric testimony is critical to presentation of the defense at trial. "In practical terms, a successful defense without expert testimony will be made only in cases so extreme, or so compelling in sympathy for the defendant, that the prosecutor is unlikely to bring them at all."
>
> Moreover the use of an expert for other, non-testimonial, functions can be equally important. Consultation with counsel attunes the lay attorney to unfamiliar but central medical concepts and enables him, as an initial matter, to assess the soundness and advisability of offering the defense. The aid of a psychiatrist informs and guides the presentation of the defense, and perhaps most importantly, it permits a lawyer inexpert in the science of psychiatry to probe intelligently the foundations of adverse testimony. "If an accused is to raise an effective insanity defense, it is clear that he will

need the psychiatrist as a witness. He will need his aid in determining the kinds of testimony to be elicited, the specialists to be consulted, and the areas to be explored on cross-examination of opposing psychiatrists."

*United States v. Taylor*, 437 F.2d 371, 377 n. 9 (4th Cir. 1971) (citations omitted).

Prior to the adoption of the Federal Rules of Evidence parallel considerations led the Court of Appeals for this Circuit to extend the attorney-client privilege to communications made by a client to an accountant who was acting as a fact-gatherer and interpreter for the lawyer. *See United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). The court wrote:

Accounting concepts are a foreign language to some lawyers . . . Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . ; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege; there can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's presence while the client dictates a statement to the lawyer's secretary or is interviewed by a clerk not yet admitted to practice. What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*.

296 F.2d at 922 (emphasis in original).

If it is necessary to protect accountant-client communications in this way, it is es-

sential to similarly protect psychotherapist-patient communications. Lawyers in general are undoubtedly more familiar with accounting concepts than with psychiatric constructs; law school courses in "Accounting for Lawyers" certainly outnumber courses in "Psychiatry for Lawyers." The one federal court to have confronted this issue squarely in a written opinion was led by just such considerations to extend the attorney-client privilege to psychiatrist-patient communications for litigation purposes.

We see no distinction between the need of defense counsel for expert assistance in accounting matters and the same need in matters of psychiatry. The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting.

*United States v. Alvarez*, 519 F.2d 1036, 1046 (3d Cir. 1975).

But even assuming that such an extension is desirable—and we have no doubt that it is—that does not answer the question before us. We must determine whether it is constitutionally compelled, whether the attorney-client privilege is embodied in the Sixth Amendment, at least to the extent of the facts in this case.

■ The Sixth Amendment right to counsel contemplates "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763, 773 n. 14 (1970). Effectiveness requires, among other things, adequate trial preparation including resort to expert witnesses where appropriate. *United States v. Wright*, 160 U.S.App.D.C. 57, 489 F.2d 1181, 1188 n. 6 (1973); 18 U.S.C. § 3006A(e). Where, as here, insanity is the principal defense, access to psychiatric experts is essential to assist the attorney in presenting an adequate case. *United States v. Taylor*, 437 F.2d 371, 377 n. 9 (4th Cir. 1971); *United States v. Chavis*, 159 U.S.App.D.C. 30, 486 F.2d 1290, 1292 (1973).

■ Were this a case involving premeditated, direct intrusion by the state into attorney-client or attorney-agent-client consultations, the constitutional invalidity would be clear. *Coplon v. United States*, 89 U.S.App.D.C. 103, 191 F.2d 749 (1951), *cert. denied*, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952) (government wiretapped attorney-client conversations). *See also Hoffa v. United States*, 387 U.S. 231, 233, 87 S.Ct. 1583, 1584, 18 L.Ed.2d 738, 740–41 (1966). But not every rule of law that impinges on or adversely effects the client's interest in the most effective possible defense is constitutionally flawed. The privilege is qualified, not absolute, and its infringement may be justified, at least in some cases, by defendant's actual or implied waiver.

In *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), Nobles' attorney was precluded from offering testimony from his investigator concerning the latter's interviews with prosecution witnesses because the attorney, citing, *inter alia*, the attorney "work product" doctrine, had refused to submit certain portions of the investigator's report to the prosecutor, who would presumably have employed it as an impeachment device.

In rejecting the argument that even a limited infringement of the work product doctrine would have deleterious effect on a defendant's right to effective assistance of counsel, the Supreme Court recently declared in the *Nobles* case:

We cannot accept respondent's contention that the disclosure order violated his Sixth Amendment right to effective assistance of counsel. This claim is predicated on the assumption that disclosure of a defense investigator's notes in this and similar cases will compromise counsel's ability to investigate and prepare the defense case thoroughly. Respondent maintains that even the limited disclosure required in this case will impair the relationship of trust and confidence between client and attorney and will inhibit other members of the "defense team" from gathering information essential to the effective preparation of the case. . . .

*The short answer is that the disclosure order resulted from respondent's voluntary election to make testimonial use of his investigator's report.* . . .

422 U.S. at 240 n. 15, 95 S.Ct. 2160, 2171 n. 15, 45 L.Ed.2d 141, 151 n. 15 (emphasis added).

Similarly, the defendant in *United States v. Woodall*, 438 F.2d 1317, 1322–26 (5th Cir.) (rehearing *en banc*), *cert. denied*, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971), claimed that he was unaware of the sentence consequences at the time he had entered a guilty plea. The attorney who represented him at the time of the plea was permitted to testify that he had, in fact, so advised the defendant. The Court of Appeals held that by offering his own testimony on this issue, defendant waived the privilege, thus enabling the attorney to give his version of their conversation prior to the plea. *See also Roberts v. Greenway*, 233 Ga. 473, 211 S.E.2d 764 (1975); *State v. Lawonn*, 113 Ariz. 113, 547 P.2d 467 (1976); *Singleton v. State*, 90 Nev. 216, 522 P.2d 1221 (1974).

This line of attorney-client waiver cases is not controlling on the facts before us. Petitioner's attorney neither called Dr. Schwartz to testify, nor had the petitioner testify about communications made to the psychiatrist during the examination.

Whether a waiver may be found in this case depends, at least in part, on considerations of fairness and the salutary concept that the trier of fact should have adequate access to as much of the available psychiatric testimony as possible where the defendant's mental state is in issue. A number of federal statutory provisions seeking to further that goal have withstood constitutional challenge. For example, while 18 U.S.C. § 4244 provides that the psychiatrist's information gathered in an investigation to determine if the defendant can understand the proceedings cannot be used at the trial, it can be used at the proceeding to determine competency to stand trial. The provision reads:

§ 4244. Mental incompetency after arrest and before trial.

Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, *the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.* A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.

(Emphasis supplied.) For an exhaustive compilation of parallel state statutory provisions see Note, Miranda on the Couch—An Approach to Problems of Self-Incrimination, Right to Counsel, and Miranda Warnings in Pre-Trial Psychiatric Examinations of Criminal Defendants, 11 Colum.J. of Law & Soc.Probs. 403, 406 n. 17 (1975).

The constitutionality of this requirement was upheld in *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956). Despite the negative language in the statute, one circuit has even recognized a district court's inherent authority to admit psychiatric testimony about a defendant's mental condition at the time of the commission of the offense based on information obtained at an examination ordered pursuant to section 4244 to determine the accused's capacity to stand trial. *See, e. g., United States v. McCracken*, 488 F.2d 406, 411 n. 3 (5th Cir. 1974) (psychiatrist appointed to determine defendant's sanity both at time of trial and at time of commission of the offense); *United States v. Jacquillon*, 469 F.2d 380, 389 (5th Cir. 1972), *cert. denied*, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973) (psychiatrist appointed to determine defendant's sanity at time of trial permitted to testify about defendant's sanity at time of the offense).

Several circuits have also rejected contentions that court-ordered psychiatric examinations solely to determine the accused's mental condition at the time of the commission of the offense constitute *per se* violations of a defendant's privilege against self-incrimination. In one such case, *United States v. Albright*, 388 F.2d 719 (4th Cir. 1968), the Court of Appeals for the Fourth Circuit noted:

The maintenance of a "fair state-individual balance" clearly required that the government be permitted to have defendant examined. Once defendant offered some evidence that he was not sane, the burden of proving legal sanity was on the government. *Hall v. United States*, 295 F.2d 26 (4 Cir. 1961). Where a defendant is indigent and claims reason to doubt his sanity, the government stands ready to supply him with the services of psychiatric experts necessary to his defense. 18

U.S.C.A. § 3006A(e). Under these circumstances, the comment in *Pope v. United States*, supra, 372 F.2d [710], p. 720, is well taken:

"It would be a strange situation, indeed, if first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense, and, second, if the government is to have the burden of proof, as it does with the competency issue in this case \* \* \* and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden."

388 F.2d at 724. *See also, e. g. , United States v. Cohen*, 530 F.2d 43 (5th Cir. 1976); *but see United States v. Alvarez*, 519 F.2d 1036, 1042 (3d Cir. 1975) (use of statements elicited in a compelled examination involved violation of privilege against self-incrimination).

Federal Rule of Criminal Procedure 12.2, requiring a defendant to give notice of a defense based upon his mental condition, provides for an examination by a government psychiatrist. While the statements of the accused may not be used as independent evidence of guilt, the opinion of the expert obviously can be. Subdivision (c) reads:

(c) Psychiatric examination. In an appropriate case the court may, upon motion of the attorney for the government, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

Failure to submit to an examination ordered under this subdivision may result in the exclusion of any expert testimony offered by the defendant on the issue of his mental state. Fed.R.Crim.Proc. 12.2(d). As Wright and Miller point out in discussing the final sentence of Rule 12.2(c), "the language finally chosen means something rather different from what it would ordinarily be understood to say." 1 Wright & Miller, *Federal Practice & Procedure* § 209, 1975 Supp. p. 152. The conference committee report declared:

The rule does not preclude use of statements made by a defendant during a court-ordered psychiatric examination. The statements may be relevant to the issue of defendant's sanity and admissible on that issue.

H.R.Conf.Rep. No. 94–414, 94th Cong., 1st Sess. 1975, p. 10, reprinted in 1975 U.S.Code Cong. & Adm.News pp. 674, 715.

Reading this provision with Rules 703 and 705 of the Federal Rules of Evidence, apparently what the defendant says can be considered by the trier in evaluating the probative force of the expert's testimony but not as evidence-in-chief. *See, e. g., State v. Whitlow*, 45 N.J. 3, 26, 210 A.2d 763, 775 (1965) (". . . evidentiary character of any inculpatory statements shall be limited expressly to the claim of insanity, and shall not be admissible on the issue of guilt.").

Provisions such as Rule 12.2 of the Federal Rules of Criminal Procedure are common in state law. *See* Note, Miranda on the Couch—An Approach to Problems of Self-Incrimination, Right to Counsel, and Miranda Warnings in Pre-Trial Psychiatric Examinations of Criminal Defendants, 11 Colum. J.Law & Soc.Probs. 403, 406 n. 18 (1975). There are numerous decisions rejecting Fifth Amendment constitutional challenges to the obtaining of psychiatric examinations of a defendant by the state and to the use of the information in court. The discussion in *State v. Whitlow*, 45 N.J. 3, 210 A.2d 763 (1965), is typical:

It would be most anomalous to say that a defendant may advance the defense of insanity, have himself examined by his own experts and then invoke the constitutional guarantees against self-incrimination for the purpose of preventing examination by the State. It would be a strange doctrine, indeed, to permit a per-

son charged with crime to put in issue his want of mental capacity to commit it, and in order to make his plea invulnerable, prevent all inquiry into his mental state or condition. To allow the accused to obtain his own expert, and after a private and unlimited conference with him and examination by him, to plead insanity, and then put forward the privilege against self-incrimination to frustrate like activities by the prosecution is to balance the competing interests unfairly and disproportionately against the public.

45 N.J. at 11, 210 A.2d at 767 (citations omitted). *See also, e. g., State v. Grayson*, 239 N.C. 453, 80 S.E.2d 387 (1954); *Castro v. People*, 140 Colo. 493, 346 P.2d 1020 (1959); *State v. Myers*, 220 S.C. 309, 67 S.E.2d 506, 32 A.L.R.2d 430 (1951); *People v. Spencer*, 60 Cal.2d 64, 31 Cal.Rptr. 782, 383 P.2d 134 (1963).

A similar argument would seem to support an implication of waiver in this case. In essence, defendant insists that he should have been permitted to produce psychiatric evidence to the effect that he was not responsible for his criminal acts by reason of mental disease or defect, while at the same time he precludes the State from offering an expert witness, who had formulated a contrary opinion, simply because the latter had examined defendant at the behest of a former defense counsel as opposed to being court-appointed or retained by the prosecution. Thus, defendant suggests that he be permitted to suppress any unfavorable psychiatric witness whom he had retained in the first instance, under the guise of attorney-client privilege, while he endeavors to shop around for a "friendly" expert, and takes unfriendly experts off the market.

Certainly defendant would have called Dr. Schwartz had his opinion been favorable to defendant's position. Just as clearly, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), had the government retained Dr. Schwartz initially and had he found defendant to be insane, the prosecutor would have been under a legal obligation to disclose this information to his adversary. Nonetheless, petitioner asserts that the trier of fact in the case at bar must, as a matter of constitutional law, be deprived of the opportunity to obtain complete insight into the defendant's claim of insanity merely because one of the expert witnesses who had examined him had done so at the request of one of defendant's former attorneys.

In rejecting this claim the New York Court of Appeals majority argued:

> A defendant who seeks to introduce psychiatric testimony in support of his insanity plea may be required to disclose prior to trial the underlying basis of his alleged affliction to a prosecution psychiatrist. Hence, where, as here, a defendant reveals to the prosecution the very facts which would be secreted by the exercise of the privilege, reason does not compel the exclusion of expert testimony based on such facts, or cross-examination concerning the grounds for opinions based thereon. It follows that no harm accrues to the defense from seeking pretrial psychiatric advice where an insanity plea is actually entered, for in such circumstances, the underlying factual basis will be revealed to the prosecution psychiatrist. Conversely, were the defendant not to enter an insanity plea, no physician-patient waiver would occur and any information divulged to the psychiatrist would remain privileged. There is, therefore, no deterrent to seeking expert psychiatric advice for, in one instance, there will be disclosure to the prosecution in any event and, in the other, disclosure will never occur. In short, no reason appears why a criminal defendant who puts his sanity in issue should be permitted to thwart the introduction of testimony from a material witness who may be called at trial by invoking the attorney-client privilege anymore than he should be able to do so by invoking the physician-patient privilege.

*People v. Edney*, 39 N.Y.2d 620, 625, 385 N.Y.S.2d 23, 26, 350 N.E.2d 400, 403 (1976) (citations omitted). While not urged by the New York Court, there may well be in-

stances where the psychiatrist seeing defendant at defense counsel's request shortly after the event, may have much more useful information than would a doctor who saw him much later when treatment and soothing time may have intervened to change the defendant's reactions.

It should be noted that New York does not provide for a complete waiver of all communications arising from the examination made at the attorney's request. What the attorney has told the doctor and, presumably, what the doctor has reported to the attorney remain protected. *Id.* at 625, 385 N.Y.S.2d at 26, 350 N.E.2d at 403 ("protected . . . by work product doctrine"). In the instant case the court forbade counsel from the state to inquire about conversations between the doctor and defendant's counsel (transcript at pp. 804–805).

Nevertheless, an examination of the law of other jurisdictions that have faced this issue indicates a view almost uniformly contrary to New York's. Relying on the attorney-client privilege, they do not permit defendant's psychiatrist to be called. *See Lindsay v. Lipson*, 367 Mich. 1, 116 N.W.2d 60 (1962); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971); *City & County of San Francisco v. Superior Court*, 37 Cal.2d 227, 231 P.2d 26 (1951); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975) (harmless error); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957). We have found only one case, *Singleton v. State*, 90 Nev. 216, 522 P.2d 1221 (1974), holding that there is a waiver in circumstances somewhat similar to those before us. In that case a former attorney of the defendant was compelled to give testimony against the defendant when other former attorneys were called by the defendant to give evidence suggesting insanity.

As a practical matter the defendant may suffer prejudice as a result of the New York rule. First, the fact that the source of adverse testimony at the trial is an expert originally employed by the defendant, rather than the state, will, if it is made known to the jury, almost certainly carry

added weight. But this problem can be met by excluding information about nexus. *Cf.* Federal Rules of Evidence, Rule 706(c) (court "may" authorize disclosure that expert was appointed by the court). In the case before us no such request was made by defendant (transcript at pp. 802–804).

Second, the New York argument proceeds on the assumption that defendants will in fact cooperate with government psychiatrists to precisely the degree that they cooperate with psychiatrists employed by their own counsel. Were this in fact so it might be true that defendants are not as a practical matter substantially prejudiced. A sufficient number of experts are available to the government in New York so that protecting communications to defense psychiatrists does not serve to "dry up" the available pool of consultants. In reality, of course, it is the fact that defendants may be more cooperative with their "own" experts that makes such an expert's conclusion particularly useful. It thus appears that as a pragmatic matter, a defendant may be prejudiced by this rule and, as a result, less open or candid with defense-employed consultants. We must decide, then, whether the balance drawn by New York is so detrimental to the attorney's effective representation of his client as to be prohibited by the Sixth Amendment.

The only federal authority clearly on point protects the privilege in these circumstances. In *United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975), the court had before it an appeal from a conviction in a federal district court. Some of the language of the opinion is constitutional in tone. Thus, the court notes:

The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of ne-

cessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness. . . . Moreover, the inhibiting effect of a rule waiving the attorney-client privilege with respect to psychiatric consultations in all cases of an insanity defense operates not only with respect to the facts of the crime but also with respect to the defendant's mental state. The attorney should not be inhibited from consulting one or more experts, with possibly conflicting views, by the fear that in doing so he may be assisting the government in meeting its burden of proof on the [insanity] issue. Thus we reject the contention that the assertion of insanity at the time of the offense waives the attorney-client privilege with respect to psychiatric consultations made in preparation for trial.

*Id.* at 1046–47.

But there was no necessity in *Alvarez* to determine any constitutional question since the court's power and duty was to determine the scope of the privilege *for federal criminal proceedings*. Privileges in such cases are "interpreted . . . in the light of reason and experience." Federal Rules of Evidence, Rule 501. This is not a constitutional test.

██ The litigation interest that might be furthered by overturning the State's decision in this case are very similar to those that would arguably be protected by requiring the presence of counsel at pre-trial psychiatric interviews conducted by government experts. A defendant's chance of ultimate success on a defense based on mental illness might well be furthered if he were able to consult with his attorney before responding to certain questions posed

at those examinations. Nonetheless, in *United States v. Baird*, 414 F.2d 700 (2d Cir. 1969), the Court of Appeals for this Circuit noted that such an interview is not a "critical stage" in the proceedings at which the presence of counsel is required, since its principal purpose is to enable the expert to gather data from which to form the basis of an opinion. The court indicated:

We are not persuaded that the procedure itself harbors substantial dangers; and, without a more adequate and less speculative showing of actual prejudice, we are not tempted to forge new constitutional rules. In the words of *Wade* [*U. S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149], the "hazards of serious unfairness to the criminal accused" have not been shown.

414 F.2d at 711. *See also United States v. Trapnell*, 495 F.2d 22 (2d Cir. 1974); *United States v. Mattson*, 469 F.2d 1234 (9th Cir. 1972); *United States v. Albright*, 388 F.2d 719 (4th Cir. 1968). *But see Lee v. Erie County Ct.*, 27 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452 (1971); *State v. Corbin*, 15 Or.App. 536, 516 P.2d 1314 (1973); *State v. Anderson*, 8 Wash.App. 782, 509 P.2d 80 (1973). That statement applies with equal force to the issue before us. We can only speculate that the New York rule results in substantial prejudice to criminal defendants.

The statements by the defendant to his psychiatrist were not admitted to establish the fact of his having committed the murder, but only to establish a basis for the psychiatrist's evaluation of petitioner's sanity at the time of the offense. Given this limited use, any possible prejudice may be balanced, within limits not exceeded in this case, by the strong counterbalancing interest of the State in accurate fact-finding by its courts.

In sum, it seems undesirable at this time to canonize the majority rule on the attorney-psychiatrist-client privilege and freeze it into a constitutional form not amenable to change by rule, statute, or further case-law development. Were we to force the State into the rigid format suggested by

the petitioner in this case by deciding that New York must, as a constitutional matter, extend privileged status to these communications, we would cut off further experimentation in this area—not only by this State, but by all state and federal courts and legislatures. We cannot say what the ultimate consensus, if any, will be on these policy issues. But it appears inappropriate and unwise at this stage to block potential branches of evolution.

Courts and legislatures must be given reasonable freedom to develop new approaches to questions of testimonial privilege. This subject is currently in a state of development, with increasing pressures for the creation of entirely new privileges, such as the social worker-client and reporter-source, and the expansion of older privileges predicated upon expanding concepts of privacy. At the same time there is continued counterpressure from the compelling interest in the ascertainment of truth in the pursuit of just determinations of legal contests. *See, e. g.,* Federal Rules of Evidence, Rules 102, 401–403, 501, 803(24). For us to force one phase of the law of evidence into the procrustean bed urged by petitioner might be to disserve the arguably desirable development of more flexible rules of privilege.

## CONCLUSION

The petition for a writ of habeas corpus is dismissed. Because of the important and novel questions involved, a certificate of probable cause is granted. Rule 22(b) Rules of Appellate Procedure.

So ordered.