UNITED STATES, Appellee,

v.

Kirby D. BLEDSOE, Jr., Airman First Class, U.S. Air Force, Appellant.

No. 51,478.

ACM 23926.

U.S. Court of Military Appeals.

May 9, 1988.

Certiorari Denied Oct. 3, 1988.

See 109 S.Ct. 129.

For Appellant: *Captain Timothy J. Malloy* (argued); *Colonel Leo L. Sergi* (on brief).

For Appellee: *Major Joseph S. Kistler* (argued); *Colonel Kenneth R. Rengert* (on brief).

## Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, a general court-martial with members found Bledsoe guilty of larceny on July 14, 1982, and of willfully damaging military property twice on December 30, 1982, in violation of Articles 121 and 108 of the Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 908, respectively. The court sentenced appellant to a dishonorable discharge, confinement for 30 months, forfeiture of $400.00 pay per month for 30 months, and reduction to the lowest enlisted grade. The findings and sentence were approved by the convening authority.

After his trial, Bledsoe petitioned the United States Air Force Court of Military Review for a new trial on the basis of new evidence as to his mental responsibility.[1] In response to this new evidence, the Court of Military Review set aside the convening authority's action and authorized further inquiry into appellant's sanity. 16 M.J. 977.

After that inquiry had taken place, a partially different panel of the Court of Military Review concluded: "We find no reasonable doubt as to the sanity of the accused at the relevant times; and we are convinced that, considering all the data presented, no different verdict would reasonably result were a new trial to be ordered." Accordingly, the request for a new trial was denied. *United States v. Bledsoe*, (unpub. order of June 22, 1984 at 1).[2]

In a subsequent opinion, *United States v. Bledsoe*, 19 M.J. 641 (1984), the Court of Military Review rejected appellant's legal contentions and affirmed the findings; but it reduced the sentence to a bad-conduct discharge, confinement for 20 months, forfeiture of $397.00 pay per month for 20 months, and reduction to the lowest enlisted pay grade. Upon appeal to this Court, we granted review of these two issues:

### I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ALLOWING THE PROSECUTION TO INTRODUCE EXPERT PSYCHIATRIC TESTIMONY IN ITS CASE–IN–CHIEF AND PRIOR TO THE DEFENSE INTRODUCING EXPERT TESTIMONY [MIL.R.EVID. 302(b)(2) ].

### II

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE

---

1. In December 1982, a sanity board at Wilford Hall, Texas, had evaluated appellant in preparation for his trial on the larceny charge; and it had determined that he was competent to stand trial and had been mentally responsible at the time of the alleged offense. At his trial in February 1983, psychiatric evidence had been presented with respect to his mental responsibility on December 30—the date of the willful damage to military property alleged in the additional charge—and this issue was disposed of adversely to him. Subsequently, Dr. Wooten,

the psychologist who had tested Bledsoe in connection with a sanity board evaluation, changed his original opinion that appellant was mentally responsible. This change was the new evidence on which Bledsoe especially relied in petitioning for a new trial.

2. In light of our opinion in *United States v. Lilly*, 25 M.J. 403 (C.M.A.1988), we see no reason to disturb the decision by the court below denying appellant's petition for new trial.

SUBSTANTIAL RIGHTS OF APPELLANT BY ALLOWING THE PROSECUTION TO ELICIT TWO STATEMENTS MADE BY APPELLANT TO A PSYCHIATRIST DURING HIS PARAGRAPH 121, M.C.M 1969 (REVISED) EVALUATION.

## I

Bledsoe was alleged to have stolen property of two fellow airmen on July 14, 1982, at Kelly Air Force Base, Texas. After having been charged with this offense, he went on leave to Houston, Texas, purportedly to see a civilian attorney in connection with his case. Once there, he committed himself to a civilian mental ward; and later he was transferred to the Air Force Regional Medical Center at Wilford Hall, Texas. There a sanity board was convened, which reported on December 22 that Bledsoe had a conversion disorder and also that he was malingering.

Appellant was advised of this report on December 29; and at that time he, presumably, was made aware that he would be returned to Kelly Air Force Base for trial on the larceny charge. The next day Bledsoe damaged the hospital room to which he had been assigned at Wilford Hall; and later that day, after being returned to Kelly Air Force Base, he damaged his dormitory room there. These acts were the basis for an additional charge with two specifications alleging willful damage to military property.

At an initial Article 39(a)[3] session, Bledsoe appeared non-responsive and incoherent in his responses to inquiries from the military judge. As a result, the judge proceeded to take evidence about his capacity to stand trial. After hearing testimony from Dr. Thomas Martin and Dr. Wallace Robert Townsend-Parchman—two psychiatrists who had served on the sanity board convened at Wilford Hall to evaluate appellant as to the larceny charge—the military

judge ruled that Bledsoe was competent to stand trial.

Later during the Article 39(a) session, the military judge asked trial counsel about his intention to produce expert testimony during the Government's case-in-chief. The response was that the prosecutor's plans were "conditioned upon the accused's demeanor raising that issue, sort of in a play-that-by-ear situation." In any event, trial counsel "anticipat[ed] bringing no more than one psychiatrist," who "would be Townsend-Parchman, the treating physician." Defense counsel expressed no objection to such evidence; and he indicated to the military judge that his own anticipated experts were Dr. Martin and Dr. Newsome, another psychiatrist, who would discuss the effects of alcohol.[4]

Subsequently, during *voir dire* of the court members, defense counsel asked about the receptiveness of the court members to a defense that Bledsoe lacked mental responsibility on December 30 when the military property was damaged. However, counsel did not state that he intended to call expert witnesses to testify about mental responsibility.

During his opening statement, assistant trial counsel outlined the government witnesses to be called and their expected testimony. In this connection, he stated that Dr. Townsend-Parchman would testify about the results of a sanity board. When this opening statement had ended, defense counsel asked for a mistrial on the grounds that "it is very improper for the Government to talk about the sanity issue here. The only sanity defense, . . . or any type of evidence whatsoever of such a defense coming out in the trial should be by the Defense. . . . The Government has commented upon it and that is highly prejudicial." Defense counsel also indicated that mental responsibility was not an issue as to the larceny charge but only with respect to the alleged damage to military

3. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

4. As to the larceny charge, the defense contended that appellant had not taken the property and also that he had been too drunk to entertain the requisite specific intent.

property. The motion for mistrial was denied; and the military judge commented that "his mental state as it relates to the offenses is up to the fact finders. I don't see any possible prejudice from him laying that out. I think, matter of fact, it even clarifies it."

Ultimately, Dr. Townsend-Parchman did testify for the Government in its case-in-chief; and the defense offered no objection to his testimony. Subsequently, the defense called Dr. Martin, who testified that he and the other two members of the sanity board had concurred in the diagnosis that Bledsoe had a "conversion disorder" even before the larceny in July. Dr. Martin had reviewed appellant's hospital records and family history, but he said that "[w]e got very little information from Airman Bledsoe." Dr. Martin could not offer "a good answer" as to whether, in light of the conversion disorder, appellant's damage to the two rooms on December 30 "was willful."

At the end of the direct examination of this witness, trial counsel

> ask[ed] for an opportunity to review the sanity board since there has been sufficient opening of that door by the testimony of Doctor Martin as to the history of the accused, particularly the statements made by the accused in the evaluation process and the Government would request permission for access to whatever statements he might have made, so we can conduct an effective cross-examination of this witness. That is Rule 302.

The defense objected and contended that Dr. Martin's testimony had not opened "any door for the Government to go behind and see what the sanity board had to say whatsoever." After reviewing the sanity board's entire summary, the military judge overruled the defense objection and provided the sanity board documents to the prosecutor.

Trial counsel then remarked:

> During the course of my investigation, by talking to Doctor Martin and talking to Doctor Townsend-Parchman, there were certain statements made by the accused during the course of the evaluation underlying the sanity board. These statements were made to these doctors and they were made known to me. Being aware of the restrictions of paragraph 121 of the Manual, however, they were not mentioned before, and I have not used this information in any way up to this point. However, it is the Government's contention that the door has been opened by Defense by asking Doctor Martin about the background history related to him by the accused and this clearly would indicate verbal statements both by the accused and by the accused's wife during the course of the sanity proceedings and the Government at this time would like to make an offer of proof as to those statements.

> \*   \*   \*   \*   \*   \*

> The one statement that was given to Doctor Martin earlier in his evaluation dealt with financial problems that the accused and his wife were experiencing and, of course, the relevancy of this is the Government contends that financial problems underlie the larcenies. Secondly, the accused stated to Doctor Townsend-Parchman, in the presence of Doctor Martin, "You are not going to get me on this offense. I'm going to beat this rap." That goes to his entire motivation, and checking himself in a hospital in Houston, which supports the Government's theory of what we have here is an attempt to avoid prosecution.

The defense objected that evidence of Bledsoe's statements would be prejudicial and lacking in probative value. The military judge, concluding that "the Defense has opened the door," overruled the objections.

On cross-examination by the prosecutor, Dr. Martin testified that Bledsoe had been "having considerable financial difficulties and as he put it, he was receiving a lot of pressure from his wife to obtain funds." In response to questions by trial counsel, Dr. Martin also testified that on December 15, 1982, he had overheard Bledsoe talking to Dr. Townsend-Parchman in the hallway of a hospital ward. As he "was passing by ... [he] heard Airman Bledsoe comment to Dr. Townsend-Parchman that, 'I am going

to show you guys. I am going to beat this rap' something to that effect and I did not stand around and listen to the rest of the conversation."

After all the evidence was received and counsel had presented closing arguments, the military judge gave extensive instructions to the court members. With respect to the alleged larceny, he did not advise the members as to mental responsibility, since appellant had defended against that charge only on the grounds that he had not taken the property and that at the time he had been too intoxicated to form a specific intent. However, as to the charge of willful damage to the two rooms, the military judge instructed not only on mental responsibility but also on partial mental responsibility as it might affect the element of willfulness. The members deliberated only half an hour before returning their findings of guilty.

## II

Mil.R.Evid. 302(b)(2), Manual for Courts-Martial, United States, 1969 (Revised edition), as originally promulgated, provided: "An expert witness may testify as to the reasons for the expert's conclusions and the reasons therefor as to the mental state of the accused, but such testimony may not extend to statements of the accused except as provided in (1)." However, prior to appellant's trial, the Rule was revised to read: "An expert witness for the prosecution may testify as to the reasons for the expert's conclusions and the reasons therefor as to the mental state of the accused if *expert testimony offered by the defense as to the mental condition of the accused has been received in evidence,* but such testimony may not extend to statements of the accused except as provided in (1)." [5] (Emphasis added.) This amendment clearly manifested an intent that prosecution experts should testify as to the accused's sanity only after the defense experts had testified. *See also* S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 65 (1981); *see* at 116 (1986).

Although Mil.R.Evid. 302(b)(2) dictates the usual sequence for the presentation of expert testimony as to sanity, it is subject to exceptions. For example, if read literally, the Rule would imply that the Government could not offer any expert testimony as to an accused's sanity, if the defense did not offer its own expert testimony and, instead, relied only on lay testimony to raise the sanity issue; but we are sure that, in amending Mil.R.Evid. 302(b)(2), the drafters never intended to mandate such a result.

■ Moreover, we cannot disregard Mil. R.Evid. 611(a), which provides:

The military judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment and undue embarrassment.

Under this Rule—to which the Court of Military Review also called attention in its opinion—we are convinced that a military judge has some discretion as to the sequence in which expert witnesses testify about an accused's sanity.

■ This discretion, however, is not unlimited; and so far as we can determine, the military judge did not exercise his discretion in an informed manner. Instead, he apparently proceeded on the premise that the Government was free to present its evidence in whatever sequence it chose. Moreover, nothing in the record indicates that the prosecution called Dr. Townsend-Parchman in its case-in-chief for any of the reasons set forth in Mil.R.Evid. 611(a). Instead, this order of presentation probably was designed to gain the tactical advantage of making the court members aware as soon as possible that the experts had come to the conclusion that appellant was malingering.

■ Even though the presentation of expert testimony should have followed the sequence contemplated by Mil.R.Evid.

**5.** Mil.R.Evid. 302(b)(1) states: "There is no privilege under this rule when the accused first introduces into evidence such statements or derivative evidence."

302(b)(2), we perceive no prejudice to appellant. Of course, appellant never claimed that he lacked mental responsibility for the larceny; and, instead, he defended on other grounds. Thus, as to this charge, he was unaffected by the error.

With respect to the willful-damage charge—as to which issues were raised of both mental responsibility and partial mental responsibility—we also are convinced that no prejudice was suffered. Both Dr. Townsend-Parchman and Dr. Martin agreed on the basic diagnosis of conversion disorder and malingering; and we see no great disadvantage to appellant because the Government's witness expressed his opinion on this score before the defense witness did so. Moreover, there is no indication that any change in the defense presentation of its evidence resulted from the Government's having called Dr. Townsend-Parchman to testify in its case-in-chief.

Furthermore, the defense did not preserve the issue effectively. *See* Mil.R.Evid. 103(a)(1). The objection and motion for mistrial were made with respect to the assistant trial counsel's opening statement about the evidence he planned to offer. No objection as to Dr. Townsend-Parchman's testifying was made by the defense when he appeared as a witness during the Government's case-in-chief.

### III

Mil.R.Evid. 304(d)(1) requires: "Prior to arraignment, the prosecution shall disclose to the defense the contents of all statements, oral or written, made by the accused that are relevant to the case, known to the trial counsel, and within the control of the armed forces." In this case, trial counsel informed the military judge that, while talking with Drs. Martin and Townsend-Parchman, he had learned about two statements by Bledsoe. It seems clear

from the record that the prosecutor had not informed defense counsel about these statements until he sought to use them in cross-examining Dr. Martin. Possibly trial counsel learned about the statements after arraignment; and if so, this information did not fall within the terms of Mil.R.Evid. 304(d)(1). Instead, under Mil.R.Evid. 304(d)(2)(B), trial counsel was under a duty to "provide timely notice to the military judge and to the counsel for the accused" if he formed an intent to offer the statement in evidence.

■ The defense did not enter any objection on grounds of untimely notice; and it did not request a continuance or other relief by reason of surprise. Instead, the defense objection centered on lack of relevance and probative value under Mil.R. Evid. 401 and 403; and so any prosecution failure to provide "timely notice" was waived.

■ Mil.R.Evid. 302(a) grants an accused "a privilege to prevent any statement made by the accused in a mental examination ordered under" the Manual for Courts-Martial "and any derivative evidence obtained through use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings." The privilege disappears, however, "when the accused first introduces into evidence such statements or derivative evidence." [6]

The privilege against use by the prosecution of any statement made by an accused in a mental examination signifies that such statement should not be revealed to the prosecution by the doctors who performed the sanity evaluation. Apparently, this obligation of confidentiality was violated.

The defense, however, did not move to disqualify trial counsel because of his receipt of privileged information. Moreover, trial counsel specifically represented that

---

**6.** Fed.R.Crim.P. 12.2(c) has a comparable provision whereunder a mental examination may be ordered upon motion by the Government, and no statement made by the defendant during this examination "shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced

testimony." As noted in *Estelle v. Smith,* 451 U.S. 454, 465–66, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981), a plea of insanity, coupled with use of psychiatric testimony, may waive the defendant's Fifth Amendment privilege with respect to use of information obtained in a mental examination for litigating the issue of sanity.

he had "not used this information in any way up to this point." We have no reason to doubt this representation by counsel; and certainly nothing in the record indicates that trial counsel's misacquired knowledge of Bledsoe's statements affected the preparation of the Government's case in any way. Thus, we need only focus on whether the military judge committed prejudicial error by allowing trial counsel to cross-examine Dr. Martin about appellant's two statements.

An accused opens the door for use of his otherwise privileged statements made during a mental examination if he "first introduces into evidence such statements *or derivative evidence.*" Mil.R.Evid. 302(b)(1) (emphasis added). Bledsoe's statements had not been introduced by the defense; but the Government claims that Dr. Martin's testimony as a defense witness was, at least in part, "derivative evidence."

We are unsure how broad this term was intended to be. We doubt that the diagnosis offered by a defense expert can, in and of itself, be considered "derivative evidence" merely because it is based in part on what the accused has told the examining psychiatrists. Otherwise, in virtually every instance in which the defense offered expert testimony as to sanity, the expert witness could be cross-examined about every statement the accused had made to him. On the other hand, "derivative evidence" seems broad enough to include any factual information provided to the evaluators by an accused.

During the direct examination of Dr. Martin, he had testified about "stresses" to which Bledsoe was subject; and, in this connection, he mentioned "financial obligation"; and trial counsel apparently considered that this reference opened the door for his asking Dr. Martin about any statement by Bledsoe concerning his financial affairs. As we read the record, the basis for this contention is weak, because Dr. Martin's reference to appellant's financial status was minimal.

With respect to appellant's statement to Dr. Townsend-Parchman concerning his intent to "beat the rap"—a statement which

Dr. Martin had overheard in the hallway— the Government contends that Mil.R.Evid. 302 is not even involved. The premise for this contention is that Bledsoe's statement was not made pursuant to a compelled sanity examination. We cannot accept the premise, because it relies on an unduly fine distinction. Bledsoe was at Wilford Hall for a sanity evaluation and talked to various psychiatrists from time to time. We assume that every remark that he made to the psychiatrists might have been taken into account in evaluating his sanity; and this would be true whether a remark was made in the context of a formal interview or instead was part of a chance encounter. It suffices that the remark was made to a member of the sanity board, Dr. Townsend-Parchman, even though Dr. Martin, another board member, had only overheard it.

■■ Even though appellant may have been entitled to prevent use of the two statements in cross-examining Dr. Martin, we do not believe that prejudicial error was committed. In the first place, the two statements would have had minimal impact on the factfinders' determination of guilt or innocence, including mental responsibility. More importantly, any privilege that Bledsoe enjoyed under Mil.R.Evid. 302 was waived by reason of the defense failure to particularize its objection, as required by Mil.R.Evid. 103(a)(1). The only objection was on grounds that the statements lacked relevance and probative value; and since no claim of privilege was asserted at trial, it cannot be asserted now on appeal.

## IV

The decision of the United States Air Force Court of Military Review is affirmed.

Judge COX concurs.

SULLIVAN, Judge (concurring):

I agree with the majority opinion that prejudicial error did not occur in this case. I would add, however, that Mil.R.Evid. 302(b)(1) must be read and applied in light of *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *See* Fed.R. Crim.P. 12.2(c). *See also United States v. Parker,* 15 M.J. 146 (C.M.A.1983).