UNITED STATES, Appellee

v.

Anthony J. CLARK, Airman First Class
U.S. Air Force, Appellant

No. 04-0722

Crim. App. No. 34791

United States Court of Appeals for the Armed Forces

Argued March 8, 2005

Decided September 30, 2005

GIERKE, C.J., delivered the opinion of the Court, in which
EFFRON, BAKER, and ERDMANN, JJ., joined.  CRAWFORD, J., filed a
dissenting opinion.

Counsel

For Appellant:  Captain L. Martin Powell (argued); Lieutenant
Colonel Carlos L. McDade and Major Sandra K. Whittington (on
brief); Major Terry L. McElyea.

For Appellee:  Captain Stacey J. Vetter (argued); Lieutenant
Colonel Robert V. Combs, Lieutenant Colonel Gary F. Spencer, and
Captain C. Taylor Smith (on brief).

Military Judge:  David Brash


**This opinion is subject to revision before final publication.**

Chief Judge GIERKE delivered the opinion of the Court.

Generally, in the absence of a privilege, any relevant statement by an accused could be admitted into evidence by the Government as a statement of a party opponent.[1] M.R.E. 302, however, maintains the integrity of the sanity review process by protecting an accused when a sanity review board is ordered under Rule for Courts-Martial (R.C.M.) 706. Any statement made by the accused or any derivative evidence obtained through use of such a statement is confidential and may not be admitted into evidence.[2] But there is no privilege under M.R.E. 302 when the accused first introduces into evidence any qualifying statements or derivative evidence.

This case presents the issue of whether the military judge violated the M.R.E. 302 privilege rule when he granted the Government's motion to compel the production of Appellant's statements in the sanity board report. We hold that the military judge erred by releasing Appellant's privileged statements to the Government. We conclude that Appellant's defense counsel did not first introduce derivative evidence. Accordingly, the defense did not trigger M.R.E. 302's exception

---

[1] See generally Military Rules of Evidence (M.R.E.) 801(d)(2) (admitting a party's own statement into evidence against that party).

[2] See R.C.M. 706(c)(5), Manual for Courts-Martial, United States (2000 ed.)(MCM).

permitting disclosure of Appellant's statements to the sanity board.

## BACKGROUND

Contrary to Appellant's pleas, a military judge found him guilty of disobeying a lawful order, wrongfully using psilocyn,[3] and breaking restriction, in violation of Articles 90, 112a, and 134, of the Uniform Code of Military Justice (UCMJ).[4] In addition, the military judge found Appellant guilty, pursuant to his pleas, of wrongfully using methamphetamine, in violation of Article 112a, UCMJ.[5] He sentenced Appellant to a bad-conduct discharge, six months of confinement, forfeiture of $600 pay per month for six months, and reduction to the grade of E-1.

When Appellant violated an order not to drive and attempted to leave base, Appellant admitted to his first sergeant, Senior Master Sergeant Crute, that he knew it was wrong to leave base while on restriction. The next day Appellant was hospitalized because his co-workers thought he displayed irregular behavior. Between May 31, 2001, and June 6, 2001, Dr. Peterson treated Appellant and prescribed a mood stabilizer, a sedative and a "very high potency anti-psychotic" medication for Appellant.

---

[3] The Air Force Court of Criminal Appeals later set aside this charge and specification on factual insufficiency grounds. United States v. Clark, 60 M.J. 539 (A.F. Ct. Crim. App. 2004).
[4] 10 U.S.C. §§ 890, 912a, 934 (2000).
[5] 10 U.S.C. § 912a (2000).

Appellant remained in Dr. Peterson's care until the end of June 2001.

At the defense counsel's request, Dr. Gregoria Marrero held an R.C.M. 706 sanity board to assess Appellant's mental responsibility for the charged offenses. She submitted a complete report of her findings. During the trial, the defense decided not to rely on the results of the sanity board. The defense instead called Dr. Peterson to testify. The military judge qualified Dr. Peterson as an expert in the field of psychiatry, and she testified about her impressions of Appellant during the period she was treating him. She described Appellant's beliefs that "he had special powers, special abilities" and "could read [people's] minds." Dr. Peterson explained that it was "fairly difficult to follow his train of thought, even though he was coherent" because Appellant was speaking very rapidly and "basically jumping from topic to topic." Dr. Peterson concluded that she believed Appellant had a manic episode, most likely due to Bipolar I disorder. Regarding whether Appellant knew the nature and quality or wrongfulness of his actions on May 29 and 30, Dr. Peterson stated, "Given the way he presented to me and my experience working with people who have had a manic episodes [sic] where it builds up over a matter of a few days, I could only surmise that it would affect his ability -- his judgment."

4

The defense did not inquire into the results of the sanity board during the direct examination of Dr. Peterson.  However, Dr. Peterson admitted that she had reviewed Dr. Marrero's report.  When asked whether she reviewed the report before forming her opinion, Dr. Peterson replied, "No and I wouldn't want to.  No.  I looked at all the other information first then met with him."  She explained that she did not base her opinion on the report.  Rather, "I just wanted to see what my colleague -- what her findings were.  I came to my own conclusion and then I wanted to look at that and see what she had drawn up."

The military judge conducted his own inquiry of Dr. Peterson and asked about the impact of the sanity board report on her diagnosis.  Dr. Peterson reaffirmed that her opinion was formed independent of Dr. Marrero's report.  But the military judge asked, "Did Colonel Marrero reference within the report any statements made by Airman Clark?"  Dr. Peterson confirmed that Dr. Marrero had included Appellant's statements in the report and that she had reviewed them.

The Government then argued that in light of the defense testimony, the Government should have an opportunity to interview Dr. Marrero regarding her examination of Appellant and to fully review her report from the sanity board.  The military judge granted the Government's motion and, over defense counsel's objection, ordered the defense to produce and to

disclose to the prosecution the sanity board report, which included Appellant's statements.  The military judge did not make any findings of fact regarding this issue and did not explain his decision.  The military judge did not allow the defense to redact Appellant's statements from the report.

As a result, the Government presented Dr. Marrero as a prosecution witness.  Although the military judge did not allow the Government to enter the sanity board report into evidence, Dr. Marrero testified to the entire contents of the report including Appellant's admissions of culpability and his attempts to feign mental problems.  Furthermore, at the trial, Dr. Marrero revealed more of her interview with Appellant than she included in her report.  For example, when Dr. Marrero questioned Appellant about his declarations to treatment staff that he was God, he responded "[t]hat he was playing along and enjoying the attention that he was getting."

## DISCUSSION

In federal civilian courts, if a defendant presents an insanity defense with expert witnesses to confirm his infirmity, the prosecution may compel the defendant to submit to a psychiatric evaluation by the Government.[6]  The medical expert who examined the accused may testify only to his conclusions and their basis and cannot reveal the contents of any statements the

---

[6] See Fed. R. Crim. P. 12.2.

accused made during the examination because the defendant is still protected by the doctor-patient privilege.[7]

Court-martial practice has a similar process to protect statements to a sanity board but different rules pertain. M.R.E. 302 guarantees a servicemember a right to confidentiality comparable to a civilian under Fed. R. Crim P. 12.2(c)(4). The military accused often must rely on military doctors for evaluation and treatment. But there is generally no doctor-patient privilege in the military.[8] As a result, the prosecution could retrieve any records of medical diagnosis or treatment. The drafters of M.R.E. 302 recognized this uniquely military concern. They noted that "even when the actual communications made by the accused are not revealed by the expert witness in open court, under the present Manual they may be studied by the prosecution and may be used to discover other evidence later admitted against the accused."[9] Accordingly, M.R.E. 302 was proposed and implemented to provide "a form of testimonial immunity intended to protect an accused from use of anything he might say during a mental examination" ordered under R.C.M. 706.[10] Contrary to the dissent's assertions, M.R.E. 302 does not

---

[7] See Fed. R. Crim. P. 12.2(c)(4). See, e.g., United States v. Curtis, 328 F.3d 141, 144 (4th Cir. 2003); United States v. Johnson, 362 F. Supp. 2d 1043, 1087-97 (N.D. Iowa 2005).
[8] See M.R.E. 501(d).
[9] MCM, App. 22, A22-7 (2000 ed.)(referring to the Manual for Courts-Martial, United States (1969 revised ed.)).
[10] Id. at A22-8.

distinguish between a psychiatric evaluation ordered by the Government and an evaluation requested by the defense. R.C.M. 706(a) allows "any investigating officer, trial counsel, defense counsel, military judge, or member" to request "an inquiry into the mental condition of the accused."[11] And M.R.E. 302 applies to any "mental examination ordered under R.C.M. 706."[12] "It is a general rule of statutory construction that 'if the statute is clear and unambiguous, a court may not look beyond it but must give effect to its plain meaning. . . .'"[13] We reject the dissent's invitation to construe M.R.E. 302 in a manner clearly inconsistent with its plain meaning.[14]

"[T]he creation of Rule 302 was purely to protect the privilege against self-incrimination of an accused undergoing a

---

[11] R.C.M. 706(a), MCM, (2000 ed.).

[12] M.R.E. 302(a).

[13] United States v. McGowan, 41 M.J. 406, 413 n.4 (C.A.A.F. 1995) (quoting Tibbs v. United States, 507 A.2d 141, 143-44 (D.C. App. 1986)). The Manual for Courts-Martial is interpreted according to rules of statutory construction. United States v. Lucas, 1 C.M.A. 19, 22, 1 C.M.R. 19, 22 (1951).

[14] The dissent does not provide any citation of authority to support its assertion that "[t]he R.C.M. 706 evaluation in this case was not one contemplated by the drafters." __ M.J. __, __ (8 n.1) (C.A.A.F. 2005) (Crawford, J., dissenting). Regardless, this situation is clearly within the ambit of the plain meaning of R.C.M. 706, which expressly lists the defense counsel as one of the individuals who shall transmit to appropriate authority that he/she has reason to believe the accused lacks mental responsibility or mental competence. Query: if the rule were as the dissent proposes, how often would a defense counsel seek an R.C.M. 706 evaluation of the accused?

mental examination . . . ."[15]  Accordingly, M.R.E. 302 includes a provision that generally prohibits use of any derivative evidence of an accused's statements to the sanity board to determine guilt or innocence or during the sentencing phase of a court-martial.[16]  "There is no privilege under this rule when the accused first introduces into evidence such statements or derivative evidence."[17]

Following the Supreme Court's decision in Jaffee v. Redmond,[18] the President adopted a psychotherapist-patient privilege for the military justice system with the implementation of M.R.E. 513.[19]  The rule allows a patient the privilege to refuse to disclose, or allow another to disclose, a confidential communication between the patient and a psychotherapist.  But this rule "is not a physician-patient privilege."[20]  Rather, it is "based on the social benefit of confidential counseling recognized by Jaffee, and similar to the clergy-penitent privilege."[21]  M.R.E. 513 intends to safeguard statements "made for the purpose of facilitating diagnosis or

---

[15] MCM, App. 22, at A22-8.
[16] See M.R.E. 302(a).
[17] M.R.E. 302(b)(1).
[18] 518 U.S. 1 (1996).
[19] Exec. Order No. 13,140, 64 Fed. Reg. 55,115, 55,116-17 (Oct. 12, 1999).
[20] MCM, App. 22, at A22-44.
[21] Id.

treatment of the patient's mental or emotional condition."[22]  An exception to M.R.E. 513, however, eliminates the privilege "when an accused offers statements or other evidence concerning his mental condition in defense, extenuation, or mitigation."[23] Because Appellant presented an insanity defense, he could not have claimed a psychotherapist-patient privilege under M.R.E. 513.

This Court has previously addressed whether an expert's diagnosis sufficiently derives from a sanity board report to warrant its release to the prosecution.  In United States v. Bledsoe,[24] the prosecution called Dr. Townsend-Parchman, a member of the accused's sanity board, to testify about the results of the board during its case-in-chief.  The defense called Dr. Martin to testify that he and two other members of the sanity board had concurred in a diagnosis that the accused had a "conversion disorder."[25]  After the direct examination of Dr. Martin, the trial counsel asked to review the sanity board report.  The prosecution alleged that Dr. Martin's testimony opened the door to the accused's medical history, "particularly the statements made by the accused in the evaluation process."[26] The trial counsel requested access to those statements alleging

---

[22] M.R.E. 513(a).
[23] M.R.E. 513(d)(7).
[24] 26 M.J. 97 (C.M.A. 1988).
[25] Id. at 100.
[26] Id.

10

they were necessary for an effective cross-examination of Dr. Martin.  The military judge overruled a defense objection and provided the sanity board documents to the prosecution.  While this Court held there was no prejudicial error in Bledsoe, we expressed "doubt that the diagnosis offered by a defense expert can, in and of itself, be considered 'derivative evidence' merely because it is based in part on what the accused has told the examining psychiatrists."[27]

In this case, the Government alleges that Appellant waived his right to the privilege by submitting derivative evidence from the sanity board, specifically expert testimony of a psychiatrist who reviewed the report.  We disagree.

The Government concedes that "the defense did not elicit statements made by Appellant during his sanity board."  The Government asserts, however, that Appellant presented derivative evidence because Dr. Peterson admitted that she had read the report before testifying and thus "opened the door" for the Government.  While Dr. Peterson admitted on direct examination that she "reviewed the sanity board [report] written by Doctor Marrero," she further clarified that she did not read the report until after forming her own opinion.  Aside from this single statement by Dr. Peterson, the defense counsel's direct examination did not mention or allude to the report or the

---

[27] Id. at 103.

11

included statements.[28] The military judge, however, elicited information regarding the sanity board report.

M.R.E. 302 was specifically drafted to allow the defense to control whether an accused's statements to a sanity board would be released to the prosecutors and presented at the court-martial. If the defense does not allege insanity at court-martial, or does so only through lay testimony, the sanity board report will not be provided to the prosecution. But "[i]f the defense offers expert testimony concerning the mental condition of the accused," the military judge shall compel the defense to release to the prosecution "the full contents, other than any statements made by the accused," of the sanity board report.[29] "If the accused presents a defense, however, which includes specific incriminating statements made by the accused to the sanity board, the military judge may order disclosure to the trial counsel of 'such statement . . . as may be necessary in the interest of justice.'"[30] While the defense chose to present an insanity defense in this case, Dr. Peterson's testimony relied only on her own treatment of Appellant and did not in any

---

[28] The dissent asserts that Dr. Peterson's testimony was "at least to some colorable degree, 'received from' or 'deduced from'" the sanity board report. __ M.J. at __ (10) (Crawford, J., dissenting). But Dr. Peterson's testimony affirms the defense's claim that Dr. Peterson did not rely on the sanity board report in her evaluation of Appellant.
[29] M.R.E. 302(c).
[30] MCM, App. 22, at A22-9 (quoting M.R.E. 302(c)).

12

way reveal to the members Appellant's incriminating statements to the sanity board.

In this case, the defense counsel's direct examination of Dr. Peterson is not derivative evidence, and therefore Appellant did not waive his right to confidentiality under M.R.E. 302. Once the defense offers expert testimony concerning an accused's mental condition, M.R.E. 302(c) allows the military judge to provide the Government with the sanity board report after redacting the accused's statements. Here, the military judge provided the entire sanity board report to the Government, and he allowed the Government to elicit Appellant's statements from a Government rebuttal witness. This violated the privilege extended to Appellant by M.R.E. 302.

The military judge abused his discretion by releasing the sanity board report to the prosecution in its entirety and allowing the Government to admit Appellant's statements into evidence. While the defense requested Appellant's sanity board, M.R.E. 302 afforded Appellant a privilege to prevent the Government from using his statements against him.

To determine the impact of the improper testimony, we must first determine whether the military judge's release and admission of Appellant's statements is constitutional error. It is not. The Supreme Court has concluded that if a defendant requests the psychiatric evaluation or presents an insanity

13

defense, "The defendant would have no Fifth Amendment privilege against the introduction of [testimony from his psychiatric evaluation] by the prosecution."[31]  Because Appellant requested the sanity board, he may not claim a Fifth Amendment violation because the Government did not compel his appearance at the board.  Here, the disclosure resulted in a trial error.  The military judge's ruling violated a privilege guaranteed to Appellant under M.R.E. 302.

"For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings."[32]  Our consideration "cannot be merely whether there was enough to support the result," aside from the military judge's error.[33]  We must also examine "whether the error itself had substantial influence."[34]  To evaluate the prejudice from the military judge's erroneous ruling, we consider "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[35]  After evaluating each of these factors, we remain uncertain whether Appellant's

---

[31] Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987).  See also United States v. Byers, 740 F.2d 1104, 1111-13 (D.C. Cir. 1984).

[32] United States v. McCollum, 58 M.J. 323, 342 (C.A.A.F. 2003) (citing United States v. Walker, 57 M.J. 174, 178 (C.A.A.F. 2002)).

[33] Kotteakos v. United States, 328 U.S. 750, 765 (1946).

[34] Id.

conviction was "substantially swayed by the error."[36]  Appellant
was prejudiced not only by the military judge's decision to
release to the Government Appellant's statements in the report,
but also by the Government's later use of those statements and
others made to the report's author to rebut Appellant's claims
of diminished mental responsibility.  The Government called only
one expert witness, Dr. Marrero, to rebut the insanity defense.
Dr. Marrero's testimony was not limited to her conclusions;
rather, she freely recalled Appellant's statements and behavior
during the sanity board.[37]  Dr. Marrero testified that Appellant
said, "I know what I was doing," and that he was not concerned
with his punishment since "the worst that could happen was
getting out of the military."  Dr. Marrero further described
Appellant's attitude when he admitted that "he was playing along
and enjoying the attention that he was getting."  Dr. Marrero
examined Appellant only once: when she conducted the R.C.M. 706
sanity board.  Accordingly, the statements that she recounted

---

[35] United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999)(citing
United States v. Weeks, 20 M.J. 22, 25 (C.M.A. 1985)).
[36] Kotteakos, 328 U.S. at 765.
[37] The dissent states that the "prosecution did not seek to admit
the accused's statement to Dr. Marrero, but to obtain the
conclusions from that expert, which are based on case-specific
facts."  __ M.J. at __ (14) (Crawford, J., dissenting).  The
prosecution, however, did attempt to admit into evidence the
entire sanity board report.  While the military judge did not
allow the report to be admitted into evidence, he did allow the
trial counsel to elicit Appellant's statements from Dr. Marrero
during direct examination.

were necessarily made as part of the sanity board process. The military judge should not have given the prosecution Appellant's statements to the sanity board. He further compounded the error by allowing the Government to elicit testimony about Appellant's statements during the cross-examination of Dr. Peterson and the direct examination of Dr. Marrero.

The Government's case relied heavily on the improper testimony of the sole member of Appellant's sanity board.[38] While Appellant's first sergeant testified that Appellant appeared normal to her on May 29, 2001, it is reasonable to assume that the military judge would have given more weight to a doctor's diagnosis. The insanity defense may have succeeded if the military judge had not released Appellant's privileged statements to the Government and allowed the prosecution to use them to his detriment.

## DECISION

The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings of guilty to Charges II and IV, their specifications, and the sentence are set aside. The findings of guilty to the remaining charge and specification are affirmed. The record is returned to the Judge Advocate General of the Air Force with authorization for a rehearing on

---

[38] We do not question Dr. Marrero's qualifications as a psychiatrist nor do we suggest that Dr. Marrero is incompetent,

16

Charges II and IV.  If there is not a rehearing on the findings, a sentence rehearing on the remaining charge and specification may be held.  If the convening authority determines that a sentence rehearing is impracticable then he may approve a sentence of no punishment.

---

as suggested by the dissent.  But we do hold that her testimony was improper under the Military Rules of Evidence.

CRAWFORD, Judge (dissenting):

The majority's application of Military Rule of Evidence (M.R.E.) 302 would allow a defendant to obtain, at Government expense, an expert mental evaluation, devoted solely to the defense, and cloak with immunity any statements made during the examination. With this immunity in place, the defense is then free to call to the stand another Government-paid expert, whose opinion and testimony were likely based, at least in part, on both the earlier examination and the statements of the defendant made during that examination. This second expert could then testify for the defense without fear that the Government could either obtain or use the defendant's statements made during the earlier examination. The majority's holding runs counter to the self-incrimination clause, is an improper balance of competing interests, and overlooks the history behind M.R.E. 302.

In describing the posture of this case, the majority omits an important, if not controlling, fact: the sanity board conducted by Colonel (Dr.) Marrero was requested by the defense, with all portions of the board report being delivered only to the defense. Although Rule for Courts-Martial (R.C.M.) 706(c)(3)(A) requires that the board's ultimate conclusions on all questions "shall be submitted to the officer ordering the examination, [under R.C.M. 706(b)(1)] . . . and to all counsel in the case, the convening authority, and, after referral, to

the military judge" (emphasis added), the results of this report -- lock, stock, and barrel -- were delivered only to the defense. This is hardly the instance of involuntary examination and compelled statements that the drafters of M.R.E. 302 had in mind.

In this case, a defense counsel zealously and creatively represented her client by skillfully manipulating the Rules for Courts-Martial, the Military Rules of Evidence, and military health care assets to achieve a case posture that counsel believed would prove most advantageous to her client at trial. That is her job. At trial, the trial counsel argued that this manipulation, and the testimony of Dr. Peterson, resulted in a waiver of Appellant's privilege under M.R.E. 302 as to statements made by Appellant to an earlier sanity board convened at Appellant's request. That is his job. In the interest of fairness and justice, the military judge construed the evidentiary and procedural rules to permit access to and use by the trial counsel of Appellant's statements at the sanity board Appellant had requested. That is his job.

Because, as the majority correctly notes, we address neither a constitutional question nor one arising under Article 31, UCMJ, it is now this Court's job to decide whether the military judge's decision to admit evidence in potential abrogation of a privilege was an abuse of his discretion.

2

United States v. Clark, No. 04-0722/AF

> The decision to admit evidence is reviewed for an abuse of discretion. Whether a conversation is privileged is a mixed question of law and fact. To find an abuse of discretion requires more than a mere difference of opinion -- the challenged ruling must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous."

United States v. McElhaney, 54 M.J. 120, 132 (C.A.A.F. 2000)(internal citations omitted). "As has often been said, the purpose of a criminal trial is truthfinding within constitutional, codal, Manual, and ethical rules. Because the privilege rules limit truthfinding by excluding legally relevant evidence, these rules are not 'favored' by the federal courts." United States v. Romano, 46 M.J. 269, 274 (C.A.A.F. 1997) (internal citations omitted).

Like other federal courts, we should not construe rules conferring privileges in such a way as to defeat both the truth-finding process and the intent of the drafters. In United States v. Bledsoe, 26 M.J. 97 (C.M.A. 1988), this Court construed M.R.E. 302, contrary to its literal language, to achieve what we perceived as the drafters' intent. We should once again construe this rule so as to preserve that same intent, and to promote the orderly administration of military justice. M.R.E. 302 provides:

> (a) General rule. The accused has a privilege to prevent any statement made by the accused at a mental examination ordered under R.C.M. 706 and any derivative evidence obtained through use of such a statement from being received into evidence against

3

the accused on the issue of guilt or innocence or during sentencing proceedings.  This privilege may be claimed by the accused notwithstanding the fact that the accused may have been warned of the rights provided by Mil. R. Evid. 305 at the examination.

(b) Exceptions.

(1) There is no privilege under this rule when the accused first introduces into evidence such statements or derivative evidence.

(2) An expert witness for the prosecution may testify as to the reasons for the expert's conclusions and the reasons therefore as to the mental state of the accused if expert testimony offered by the defense as to the mental condition of the accused has been received in evidence, but such testimony may not extend to statements of the accused except as provided in (1).

(c) Release of evidence.  If the defense offers expert testimony concerning the mental condition of the accused, the military judge, upon motion, shall order the release to the prosecution of the full contents, other than any statements made by the accused, of any report prepared pursuant to R.C.M. 706.  If the defense offers statements made by the accused at such examination, the military judge may upon motion order the disclosure of such statements made by the accused and contained in the report as may be necessary in the interests of justice.

This rule is designed to balance the competing interests of the self-incrimination clause and the insanity defense.  Under the rule, the "prosecution may compel the accused to submit to government psychiatric examination."  But that expert may testify "only as to his or her conclusions and their basis and not the contents of any statements by the accused during the examination."  MCM, App. 22, A22-7.

4

FACTS

On May 29, 2001, Appellant, when he was restricted, was arrested for wrongfully trying to leave the post.  Appellant's first sergeant testified Appellant appeared normal when he was brought back to the unit.  However, the next day Appellant was hospitalized because of what a co-worker thought was bizarre behavior.  Dr. (Major) Karen Peterson, a psychiatrist, treated Appellant from May 31 to June 28, 2001.

Later, pursuant to a defense request, the convening authority ordered a sanity board.  The sole member of the board was Dr. (Colonel) Gregoria Marrero, a forensic psychiatrist.  Upon completion of the examination, the sanity board report was returned directly to the defense team and not given to the trial counsel or the convening authority.  While Dr. Marrero agreed with Dr. Peterson that Appellant suffered from a manic episode on May 29-30, 2001, Dr. Marrero concluded that Appellant knew what he was doing on those dates, and his hospitalization was due to malingering.  After the sanity board, Appellant obtained the assistance of Dr. Peterson as a confidential consultant and notified the prosecution of the intent to raise the lack of mental responsibility as a defense.  At trial, the defense called Dr. Peterson as an expert witness.  She opined that there was a "high likelihood" that Appellant was suffering from a severe mental disease or defect on May 29 and 30, 2001.  As a

result of this, it would be difficult for Appellant to appreciate the nature and quality or the wrongfulness of his actions.

The record of trial reveals the following colloquy between defense counsel and Dr. Peterson:

Q.   Was there anything else that you used to formulate that opinion?

A.   This week, I also met for the first time an Airman Paytas and she described the change in his behavior back at this period of time.  I also reviewed the sanity board written by Doctor Morrero [sic].

Q.   Now, did you review that prior to formulating your opinion?

A.   No and I wouldn't want to.  No.  I looked at all the other information first then met with him.

Q.   So, did you use that as part of your opinion, to base your opinion on?

A.   Not to base my opinion on, I just wanted to see what my colleague -- what her findings were.  I came to my own conclusion and then I wanted to look at that and see what she had drawn up.

Emphasis added.

The following inquiry was with the military judge:

Q.   Major, have you seen the charge sheet in this case?

A.   Yes, I have.

Q.  Do you know the offenses that were alleged to have occurred at approximately 29 or 30 May?

A.   I don't recall the specifics of them.

Q. Did you sit down and go through the elements -- what we call the elements of the law in those offenses?

A. Yes, I did.

Q. Okay. So you've taken that in your [sic] account in your ultimate assessment?

A. Yes.

Q. You told us that you looked at the medical records that Airman Clark had maintained on him over at the hospital correct?

A. Right.

Q. Do those include prior mental health records?

A. No. He did not have any.

Q. Had none? My next few questions come from a vantage point of ignorance, I'm afraid. The only person who has seen the full sanity board report is Captain Johnson [the defense counsel], Airman Clark, of course and I assume you have seen it. We haven't seen it so some of my questions may be a little off cue, because I don't know what's in the thing.

A. Okay.

Q. Apparently Colonel Marrero rendered a diagnosis during the course of that report, is that right?

A. She said rule out -- she would rule out several diagnoses. She didn't pin point anything.

Q. Okay. Did Colonel Marrero reference within the report any statements made by Airman Clark?

A. Yes, she did.

Q. Did you read those?

A. Yes.

Q. So you're [sic] overall assessment is based on the following: your inpatient contact with Airman Clark 30 [sic] through 6 June?

A. Right

7

. . . .

Q.  You reviewed Colonel Marrero's assessment in the sanity board report to include both narrative and certain statements attributed to Airman Clark?

A.  Right.

Q.  You took a look at the charge sheet and reviewed what we call elements of the law?

A. Uh-huh. Right.

Q.  Affirmative response.  And you reviewed the DSM-IV is that correct?

A.  That's correct.

Q.  Aside from your own professional experience, anything else brought to bear upon your ultimate opinion?

A. No. No, Sir.

Emphasis added.

The military judge ruled that after Dr. Peterson's testimony, M.R.E. 302 no longer barred the testimony of Dr. Marrero as to either Dr. Marrero's opinions or the statements of Appellant made during Dr. Marrero's examination.

"Ordered Under R.C.M. 706"

M.R.E. 302 is designed to ensure Fifth Amendment protections when "the accused" is "ordered under R.C.M. 706" to submit to a Government psychiatrist.[1]  In this case, the

---

[1] One can parse the language from R.C.M. 706(a) to support a number of positions.  The R.C.M. 706 evaluation in this case was not one contemplated by the drafters.  It was requested by the defense, and returned to the defense, but not to the commander or convening authority.  Any defense counsel would like any number of these types of evaluations until they get the one they desired.

examination the defense would like to exclude was one requested by the trial defense team and returned only to that team. This was not the type of examination contemplated by M.R.E. 302. R.C.M. 706 permits the Government to order a psychiatric examination of an accused, an examination to which the accused must submit if he or she wishes to introduce expert testimony in support of an insanity defense. Once the defense of lack of mental responsibility is raised by the defense, M.R.E. 302 allows testimony or other evidence regarding the conclusions of the R.C.M. 706 examination, but generally excludes statements made by the accused.

In this case, because the defense was dissatisfied with the results of its essentially "private" R.C.M. 706 board, it called Dr. Peterson, Appellant's treating psychiatrist, to testify. She reviewed the full report of Dr. Marrero's R.C.M. 706 board before testifying.

In 1987, the Supreme Court addressed this dilemma:

> [I]f a defendant requests such [a psychiatric] evaluation or presents psychiatric evidence, then at the very least, the prosecution may rebut this presentation with evidence from reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987).

"Derivative" Evidence

M.R.E. 302 does not apply when the defense introduces evidence "derivative" of the sanity board. "Derivative" is defined as "a word formed from derivation." A secondary meaning is "something derived." "Derived" is defined as "to take or receive esp. from a specified source." Webster's New Collegiate Dictionary 342 (1983). As indicated, derived means "receive from." Major (Dr.) Karen Peterson's testimony was, at least to some colorable degree, "received from" or "deduced from" Colonel (Dr.) Gregoria Marrero and the statements that Appellant had made to Colonel Marrero. Once Dr. Peterson testified, Dr. Marrero was permitted to testify as to both her findings and Appellant's statements.

The majority holds that, even if the defense perverts the mechanism of R.C.M. 706 to receive an essentially private psychiatric examination, uncontemplated by the drafters, the results of which the defense does not like, then both the results of that examination and Appellant's statements would remain privileged under a rule intended to protect statements made in the course of a compliant R.C.M. 706 inquiry. This result, the majority reasons, is compelled by a plain reading of both rules, notwithstanding subsequent use of both those results and statements by a second defense expert who is called to testify to contrary conclusions after a second examination. In

answer to the majority's query,[2] I must posit a corollary:  If

the rules were as the majority proposes, what defense counsel

would not be per se ineffective in failing to request such an

R.C.M. 706 inquiry?

The same scenario in this case was presented to Judge

Weinstein in United States ex rel. Edney v. Smith, 425 F. Supp.

1038 (E.D.N.Y. 1976) aff'd without opinion, 556 F.2d 556 (2d

Cir.), cert. denied, 431 U.S. 958 (1977).  Edney, at his trial,

raised the insanity defense and called a psychiatric expert to

testify on his behalf.  The court permitted the prosecution to

call in rebuttal the psychiatrist who originally examined the

defendant at counsel's request for the purpose of trial

preparation.  This psychiatrist testified for the Government

that Edney did not suffer any mental disease or defect and

appreciated the nature of his acts.  Judge Weinstein delivered a

lengthy and careful decision and concluded that although the

psychiatric testimony may have been privileged, the defendant

waived any attorney-client privilege by offering the expert

testimony on the insanity defense.  A number of other courts

have done likewise, including the Supreme Court of Washington in

State v. Pawlyk, 800 P.2d 338, 350 (Wash. 1990); see also

Pawlyk v. Wood, 248 F.3d 815 (9th Cir. 2001).

---

[2] __ M.J. __ (8 n.14).

Insanity Defense

A third exception is M.R.E. 302(c), which recognizes that the defense waived the privilege under M.R.E. 302 by presenting testimony from Dr. Peterson. Once the "defense offers expert testimony concerning the mental condition of the accused, the military judge . . . shall order the release to the prosecution of the full contents . . . of any report prepared pursuant to R.C.M. 706." Thus, the privilege under M.R.E. 302(a) did not extend to the testimony of Dr. Marerro when the defense first called Dr. Peterson to the stand, and used her findings and conclusions resulting from a psychiatrist examination of the defendant to show lack of mental responsibility.

M.R.E. 302 protects direct communications with the expert. Generally, consulting with the expert does not create an opposing witness. But when an attorney asks an expert to examine his client to gain the expert's opinion, that opinion will be privileged except when the defense seeks to employ that report to improve the opinion of another expert and to prevent any counter arguments. The opinions of both experts do not rely totally on statements from the accused but include other information from other sources, including witnesses as to the specific facts. While the first expert's opinion is privileged, the opinion is only partially related to the accused's communication. But even those communications that are

12

privileged, either under the Fifth Amendment or the attorney-client privilege, are waived when there is a derivative use of the first expert's report as in this case. M.R.E. 302. Cf. United States v. Olivero, 39 M.J. 246 (C.M.A. 1994) (failing to catalog or seal the statements resulted in the inference of derivative use, allowing the inference that the witness's statements were obtained prior to the immunized statements, whether or not it was seen or relied upon). See also United States v. Mapes, 59 M.J. 60 (C.A.A.F. 2003) (timing by itself was enough to show derivative use). A member of the prosecution may not, in the first instance, interview or call the expert from the first sanity board. But M.R.E. 302 does not render the first expert completely incompetent to testify. If that testimony is contrary to the defense position, it should not allow the defense to continue shopping around until it finds an opinion to its liking. To expand the Fifth Amendment and the attorney-client privilege to exclude the first expert's opinion when the defense has the second expert examine that report deprives the trier of fact of the benefit of valuable expert advice. Edney, 425 F. Supp. 1038; Pouncy v. State, 353 So.2d 640, 642 (Fla. Dist. Ct. App. 1977); State v. Carter, 641 S.W.2d 54, 58 (Mo. 1982). The defense should not be allowed to bury the witness or corner the market on expert witnesses. Cf. United States v. Warner, ___ M.J. ___ (C.A.A.F. 2005)(requiring

comparable witnesses for defense).  The fact that the statements of the accused were elicited by Dr. Marrero does not mean they are always privileged if the defense seeks to admit these same statements through Dr. Peterson.  But as mentioned, Dr. Marrero's opinion does not rely solely on the accused's statements but also on case-specific facts and third-party descriptions of the accused's behavior and reactions on particular occasions.

In this case, the prosecution did not seek to admit the accused's statement to Dr. Marrero, but to obtain the conclusions from that expert, which are based on case-specific facts.  This is permissible when there has been derivative use of her opinion and report.  Thus, Dr. Marrero should be able to give her opinion, which is based on observations of the accused, third parties' descriptions of the accused's behavior, and other facts surrounding the conduct.  What the majority seeks to do is transform the privilege under M.R.E. 302 unto a broad rule of incompetency that undermines the truthfulness of a criminal trial.  The result is to unnecessarily expand the privilege. For these reasons, I respectfully dissent.